# Brandt's Appeal.

In order to charge lands devised, with the payment of a legacy, it must appear by direct expression, or plain implication, that such was the intention of the testator: otherwise the claim of the legatee will not follow the lands into the hands of a purchaser from the devisee.

Appeal from the decree of the orphans' court of *Cumberland* county.

This cause having been decided upon a single point, which was decisive of the rights of the parties, no other statement of facts is necessary than that contained in the opinion of the court.

*Biddle* and *Reed*, for appellants.
*Graham* and *Watts*, for appellees.

[Brandt's Appeal.]

The opinion of the Court was delivered by

Huston, J.—George Pence, administrator of Barbara Pence, claimed from the representatives of Martin Brandt, the elder, the amount of a certain legacy—or rather as David Brandt was dead, having in his lifetime sold his land to his uncle, Martin Brandt, the elder, the application was to recover the amount claimed from these lands, on the ground that the legacy was a lien on the land in the hands of whoever became the owner.

In order to avoid confusion in names, I shall designate the several persons called Martin Brandt as follows: The grandfather, Martin Brandt, from whom the land originally came, I call Martin the first; his grandson, Martin, who with David got the title from him, I call Martin the second; Martin, the son of Martin the first, and uncle of Martin the second, I call Martin the third; he in the suit is called Martin the elder; Martin, the son of the last, who is now dead, and whose children by the guardians are parties, I call Martin the fourth. Martin the first had a son Philip, who made a will in 1803, proved in June 1808, in which are the following clauses: "Next my will is that my two sons, Martin and David, shall have the plantation I now live on, to be divided in this manner: Item—I give and bequeath to my son Martin, his heirs and assigns forever, all the land lying on the north side of Yellowbreeches creek: Item —I give to my son David, his heirs and assigns forever, the remaining part of my plantation lying on the south side of Yellowbreeches creek. Next it is my will, and I order that each of my sons shall have liberty to take half the water out of the dam on his own land." He then bequeaths certain specific personal property, and proceeds as follows: "Next it is my will, and I order that my plantation in Hanover township, Dauphin county, is to be sold by my executors within one year from this date, if convenient, and the money to be paid towards the discharging my legal debts, and if not sold by my executors, they to have power to rent it to the best advantage. Further it is my will, and I give and bequeath to my wife Mary, and each of my four daughters Mary, Elizabeth, Barbara, and Catherine, shall have the sum of two hundred and fifty pounds, to be paid to them by my sons in fifty pound payments, after all my debts are paid. Further, it is my will that the first fifty pounds, after my just debts are all paid, is to be paid by my sons to my wife Mary. Further, it is my will that my daughter Mary Shenk, wife of George Shenk, shall not receive any more of her share until my wife and three daughters, Elizabeth, Catherine, and Barbara shall be made equal to her; and it is my will that the bond that is lodged at Harrisburg against my son-in-law, George Shenk, is not to bear interest; and my daughter Elizabeth is to have her chest, saddle and bridle, bedstead and bedding, and each of my four daughters are to have a saddle, bridle, and bed, over and above their shares, out of my personal estate. And further, it is my will that my wife and children live together for two years

or longer, and go on with the house I have begun. And it is my will that my executors shall have power to appraise the work done by my son David, towards the building the house on my son Martin's land, for which my son Martin is to help David again, when he wishes to build on his own land, to the value the men shall appraise the work done by my son David. Next it is my will my son David is to have liberty to chop timber on my son Martin's land, and make six hundred rails, and the tops thereof for firewood, when he goes on his own land to live." The testator then appoints his son Martin and his two brothers Adam and Abraham his executors.

It appeared that Philip the testator, a few weeks before making this will, had purchased from his father, Martin the first, the land devised to his two sons, for the price of 2603 pounds 11 shillings and three pence, and paid on the purchase 363 pounds 2 shillings and 6 pence, and taken possession on the 1st of April 1803. The contract with his father *was only a parol* one. On the 10th of April 1804, old Martin the first conveyed the tract of land to his two grandsons, Martin the second and David, devisees of Philip, and who were then in possession. Each took possession of his share as designated in the father's will. The conveyance recites the parol contract made with Philip for 2603 pounds 11 shillings and 9 pence, and the payment of 363 pounds 2 shillings and 6 pence by Philip, on account of the purchase, and recites that part of the will of Philip which devises the land to his two sons, Martin and David, and conveys the land in pursuance of the will, and subject to its provisions. The *receipt on the deed* is to the grantees, Martin the second and David, for the balance of the purchase-money, viz., 2240 pounds 9 pence. On the same 10th of April 1804, Adam and Abraham Brandt, two of the executors of Philip, gave thirteen bonds to Martin the first for the payment of this balance: one of said bonds for the payment of 476 pounds 13 shillings and 6 pence, on the 1st of May 1804, with interest from the 1st of May 1803; eleven of said bonds each for 150 pounds, payable on the 1st of May 1804, and each year to 1814, inclusive; and the thirteenth and last bond for the payment of 153 pounds 11 shillings and 6 pence, on the 1st of May 1815. On the same 10th of April 1804, Adam and Abraham Brandt took thirteen bonds corresponding in amount and times of payment with Adam and Abraham's bonds to Martin the first; and on the 12th of April 1804, took a mortgage from Martin the second and David, on the tract sold to them, to secure the payment of these bonds.

David Brandt, a short time before his death, entered into a parol agreement to sell his part of the above land to his uncle, Martin the third, for 1000 pounds, and Martin the third entered into possession; but no conveyance was executed by David, who died intestate in March 1807. Letters of administration were issued on the 11th of March 1807, to his brother, Martin the second, and his

uncle Abraham, who, it will be remembered, were two of the executors of Philip Brandt. These administrators of David, in pursuance of a decree of the orphans' court of Cumberland county, executed a deed on the 22d of April 1807, to Martin the third, for the land which had been David's. And the said Adam and Abraham Brandt, two of the executors of Philip Brandt, released the lands of Martin the second and Martin the third (which had been David's) from the mortgage given as above by Martin the second and David, to secure the purchase-money due to Martin the first; this was done on the 18th of May 1807.

But we must go back. On the 17th of November 1806, David Brandt had entered into articles of agreement with the executors of his father, for the purchase of the Dauphin county lands, for the price of 1200 pounds; and on the 4th of May 1807, the administrators of David petitioned the orphans' court of Dauphin county, for an order to sell this land of David, to pay his debts. In the schedule of debts they returned twelve bonds, of 200 dollars each, due to Abraham and Adam Brandt, and 500 pounds due to two of his sisters. On the 30th of September 1807, they sold this Dauphin land to George Shenk, (a brother-in-law, to whom 250 pounds of the legacy was devised,) for 1495 pounds. The administrators of David settled an account in Dauphin county, in 1808, and charged themselves with 1000 pounds, received from Martin the third for David's land in Cumberland, and 1495 pounds, the price of the Dauphin land.

The account or statement made out by the auditor, follows up the transactions for many years, and states that the estate of Martin the second ought to be charged with a large sum due to David's estate. Martin the second died in 1815, and Abraham became surviving administrator, and filed an account showing a balance in his hands; his account was excepted to, and so it remains.

The executors of Philip filed an inventory soon after his death, showing an amount of personal property of about 500 pounds beyond and above the specific legacies. They never settled any account. It is unnecessary to follow these statements any farther, because we are all of opinion that the claim of the plaintiff below was not such a lien on the estate, or rather on the Cumberland lands of David, as to be a continuing lien on them in the hands of the appellants, who are the children and grandchildren of Martin the third.

In England, as has been observed in other cases, lands are not, or until lately were not, liable for all debts; and neither devised lands, nor those by descent, were liable for legacies, unless made so by will; and the decisions of their courts are full of cases, showing when and how lands may become liable to pay legacies. In this country, all lands are liable to be sold on all and any judgment against the owner of the land. And if a man has a devise made to him and accepts of it, and at the same time and by the

VIII.—S

will of the same testator, is directed to pay a legacy to another person, and is sued for that legacy and a judgment obtained against him, the amount may be levied from any goods or lands which he owns, without regard to whether he holds those lands by descent, devise or purchase; *e. g.*, a man bequeaths to his son all his goods in a particular store, and directs that son to pay 100 dollars to a sister; if he accepts the store, he must pay her the 100 dollars; and if she sues and recovers judgment, it may be collected by the sale of any goods or lands of the son. There is, then, no doubt the legacy of the plaintiff could have been collected from David and Martin by the sale of their lands, if necessary; but it does not follow that it can be collected from the lands devised to them, if fairly sold to a purchaser.

There is, however, a class of cases in which a legacy may be a lien on lands devised, in the hands of a *bona fide* purchaser from the devisee; but it must be a case in which a specific legacy is annexed as a condition to the devise, or where the lands are devised subject to the payment of a sum or several sums. I shall not undertake to specify every form of expression in a will, which may make a legacy a continuing lien on lands devised. It must, however, appear, by direct expression or plain implication, that such was the intention of the testator, or the claim of the legatee will not follow the lands into the hands of an innocent purchaser. We can discover no such intention here. We do not know how much Philip was indebted, further than that he owed 2240 pounds to his father and 200 pounds to his brother Adam, which he had borrowed to make his first payment of 363 pounds to his father; and we know he had begun to build a house, which he directed to be finished after his death. We do not know that the money due to his father for the land purchased, was not all to be paid till 1815. The old man gave so long to his grandsons, but we have no evidence that such were the terms on which Philip was to have it.

On the death of David, or soon after, 2490 pounds came into the hands of his administrators; those administrators were also executors of Philip, the father of David; if it was not applied to pay Philip's debts, we do not know to what it was applied. It might have been foreseen that a sale by one or both the sons would become necessary to enable them to keep the land. The land is given to them absolutely; and in a subsequent clause, and after making sundry other provisions on different subjects, he gives these legacies to his widow and daughters, to be paid by his sons after his debts were paid. If the sons accepted the lands devised, they became personally liable to pay the legacies at the times and in the payments directed by the will; if not paid, the legatees could sue and recover them by levy and sale of any goods or lands of the devisees; but there is nothing like a condition that the title should not vest, unless the legacies were paid, or before they were paid. Upon the acceptance of the lands, Martin and David became per-

[Brandt's Appeal.]

sonally liable for the legacies, and all the estate they then had or should acquire, would be subject to levy and sale for the payment of them; and this was all the security which the testator gave for the money. If these legacies are a continuing lien on the lands devised to the sons, and follow the lands into the hands of an innocent and *bona fide* purchaser, it is not easy to see how any person can devise lands to a son and direct him to pay any sum to another, without making that sum a mortgage on the land devised. It may be true, that every testator intends the legacies he gives should be paid; but it is not true, that every testator intends to encumber and embarrass the lands he gives a son; if he does mean so to do, he says so; if he does not say so, if he gives the lands absolutely and not conditionally, the legatee must take the security the testator gave him, and courts cannot give him any more.

Decree reversed.